# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NEURVANA MEDICAL, LLC, a Delaware limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2019-0034-KSJM |
| BALT USA, LLC, a Delaware limited liability company, BALT INTERNATIONAL, a French S.A.S., DAVID FERRERA, an individual, and PASCAL GIRIN, an individual, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: November 26, 2019
Date Decided: February 27, 2020

Jason A. Cincilla, Amaryah K. Bocchino, Ryan W. Browning, Tye C. Bell, MANNING GROSS + MASSENBURG LLP, Wilmington, Delaware; John M. Pierce, Michael M. Pomerantz, Elizabeth C. DeGori, Matthew J. Kokot, PIERCE BAINBRIDGE BECK PRICE & HECHT LLP, New York, New York; *Counsel for Plaintiff Neurvana Medical, LLC.*

Lori W. Will, Phillip R. Sumpter, Daniyal M. Iqbal, Jeremy W. Gagas, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; Dylan J. Liddiard, Charles A. Talpas, WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; Brian J. Levy, WILSON SONSINI GOODRICH & ROSATI, P.C., New York, New York; *Counsel for Defendants Balt USA, LLC, Balt International, S.A.S., David Ferrera, and Pascal Girin.*

**McCORMICK, V.C.**

The main plot in this case follows one trending storyline—that of the post-closing earn-out dispute. The plaintiff, Neurvana Medical, LLC ("Neurvana") sold a medical device that required regulatory approval and commercialization. In an effort to allocate the risk associated with the device, the parties agreed to a post-closing earn-out structure. Under that structure, the buyer, Balt USA, LLC ("Balt USA") would pay additional post-closing consideration upon the achievement of milestone events such as regulatory approval. The asset purchase agreement gave Balt USA sole discretion post-closing on how to achieve the milestones, but it also obligated Balt USA to use commercially reasonable efforts in doing so. When Balt USA failed to achieve the regulatory approval condition to the first milestone payment, Neurvana commenced this litigation. Neurvana asserts claims for breach of the commercially reasonable efforts provision along with a boatload of other contractual and tort claims.

The subplot of this case involves another familiar storyline—that of the conflicted fiduciary. The chairman of Neurvana's board, David Ferrera, doubled as an executive of Balt USA and was thus conflicted with respect to the sale of the medical device. Rather than distancing himself from negotiations, Ferrera inserted himself into the thick of them, and even hired his long-time personal attorney to advise Neurvana. Neurvana's board became concerned that this duo were overly soft in negotiations, but the board allowed Ferrera and his attorney to negotiate on

1

behalf of Neurvana and enter into a term sheet setting out the basic economic terms of the asset purchase agreement. After the term sheet was executed, Neurvana replaced Ferrera's attorney and Ferrera was asked to resign from the board. Neurvana claims that Ferrera breached his duty of loyalty in negotiating the transaction, and that Balt USA's CEO, Pascal Girin, aided and abetted in this breach.

Ferrera and Girin moved to dismiss the claims against them for lack of personal jurisdiction under Rule 12(b)(2), and all of the defendants have moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6).

The outcome of these motions is that the subplot overtakes the main. This decision denies the Rule 12(b)(2) motion as to Ferrera in light of the Delaware LLC Act's implied consent statute, but it grants the Rule 12(b)(2) motion as to Girin because the complaint fails to support the conspiracy theory of jurisdiction. This decision largely grants the defendant's Rule 12(b)(6) motion, dismissing all contractual and tort claims relating to the post-closing earn-out dispute, and denying the motion only as to the claim against Ferrera for breach of the duty of loyalty. The complaint pleads facts making it reasonably conceivable that Ferrera, who could not be presumed disinterested or independent due to his dual roles as fiduciary of both Balt USA and Neurvana, breached his duty of loyalty to Neurvana when he negotiated the economic terms of the asset purchase agreement.

2

## I.    FACTUAL BACKGROUND

The background facts are drawn from the Verified Complaint and the documents it incorporates by reference.[1]

### A.    The Parties

In 2011, Ferrera co-founded Blockade Medical LLC ("Blockade"), a company focused on developing catheter-based therapeutic devices for the treatment of cerebral aneurysms.  By 2016, Blockade owned one commercial product and had three products in development.

In September 2016, Balt International, S.A.S ("Balt International"), a French medical device company, acquired Blockade's commercial product and California headquarters.  Blockade became Balt USA, a Delaware limited liability company. Ferrera became Balt USA's COO and President, and Girin, the CEO of Balt International, became Balt USA's CEO.

Balt International did not acquire the three Blockade products still in development—Titan, Lumenate, and Dimension.  Those products were spun out to Neurvana, a new Delaware limited liability company.  Ferrera became a member of Neurvana and was named Chairman of Neurvana's board of managers (the "Board").

---

[1] C.A. No. 2019-0034-KSJM, Docket ("Dkt.") 1, Verified Compl. ("Compl.").

3

**B.       Ferrera Negotiates Terms of a Sale of Titan to Balt USA.**

Of Neurvana's three products, Titan was the closest to launch at the time of the 2016 transaction.  Titan is a catheter used to guide or deliver another medical device to the brain in order to treat neurovascular conditions.  In mid-2017, Balt USA submitted a letter of intent to purchase Titan.

Over the summer of 2017, Balt USA and Neurvana negotiated the sale of Titan.  Although Ferrera served dual roles as both Neurvana's Chairman and Balt USA's COO and President, Ferrera was involved in these negotiations on behalf of Neurvana.  During those negotiations, Ferrera retained his own "long-time corporate counsel" to represent Neurvana.[2]

On August 1, 2017, Neurvana and Balt USA entered into a letter agreement (the "Letter Agreement").  The Letter Agreement attached a non-binding term sheet (the "Term Sheet") and stated that it was the "intent of the parties that their discussions initially proceed based on the term sheet."[3]   The Term Sheet contemplated that Neurvana would sell Titan to Balt USA for a purchase price of up to $16 million.  Balt USA would pay $250,000 up front and the rest post-closing.  The post-closing payments would be conditioned on the achievement of contractually defined milestone events, which included regulatory approvals.

---

[2] Compl. ¶ 33.

[3] *Id.* ¶ 35; Dkt. 28, Transmittal Aff. of Lori W. Will in Supp. of Defs.' Opening Br. in Supp. of Their Mot. to Dismiss Pl.'s Verified Compl. ("Will Aff.") Ex. 1, at 1.

At the time of the Letter Agreement, Titan required 510(k) FDA regulatory approval in the United States and Conformité Européene Mark ("CE Mark") approval in Europe.  The Term Sheet established milestone payments for each.  It provided for a $250,000 "CE Mark Milestone" payment to be made when Neurvana received written notice, on or prior to September 30, 2018, that the CE Mark could be "lawfully affixed" to Titan.[4]   It further provided for a $250,000 "510(k) Milestone" payment to be made when Neurvana received written notice, on or prior to September 30, 2018, of 510(k) clearance from the FDA.[5]  The Letter Agreement assigned to Neurvana the responsibility to achieve both regulatory approvals.  The rest of the payments related to "Commercial Milestones,"[6] which would be calculated using a formula tied to Titan's revenue but were capped at $15.25 million.

### C.    After Negotiating the Term Sheet, Ferrera Is Asked to Resign from the Board.

Over the course of the negotiations leading to the Letter Agreement and Term Sheet, the Board became increasingly concerned with Ferrera's involvement.  The Board worried that the attorney Ferrera installed "had been soft on multiple elements of the negotiation."[7]  During this period, Ferrera allegedly "became abusive" toward

---

[4] Will Aff. Ex. 1, at 6.

[5] *Id.*

[6] *Id.*

[7] Compl. ¶ 36.

5

Neurvana CEO Tom Fogarty, repeatedly "butted heads" with Board members,[8] called for the removal of Fogarty as Neurvana CEO, sent Fogarty "several abusive emails and texts,"[9] and made culturally derogatory statements.[10]

After the Letter Agreement was executed, the Board removed Ferrera's chosen counsel and ultimately secured Ferrera's resignation. Around August 2017, the Board appointed new counsel to represent Neurvana during negotiation of a confidentiality agreement with Balt USA. Then, in September 2017, the Board recommended that Ferrera resign from his position as Chairman.

Ferrera officially resigned from his position as Chairman on November 10, 2017. He and Neurvana entered into a consulting agreement (the "Consulting Agreement")[11] whereby Ferrera agreed not to divulge Neurvana's confidential information or make disparaging statements about Neurvana. In exchange, Neurvana allowed Ferrera's equity interests to continue to vest during the consulting period, which ended on January 1, 2019.

The Complaint is unclear as to who negotiated on behalf of Balt USA for the acquisition of Titan prior to Ferrera's resignation from the Board. The Complaint

---

[8] *Id.*

[9] *Id.* ¶ 39.

[10] *Id.* ¶ 37.

[11] Compl. Ex. D.

does allege, however, that Girin negotiated directly with Fogarty and Neurvana's new outside counsel after Ferrera's resignation.

**D.     Neurvana Struggles to Obtain Regulatory Approvals.**

By early December 2017, Neurvana grew concerned that it would not achieve the CE Mark milestone memorialized in the Term Sheet. Neurvana's concern stemmed in part from the difficulties it had encountered with a process called "sterilization validation."[12] Like many medical devices, Titan must be sterilized before use, and the sterilization validation process determines the appropriate sterilization method. There are several different types of sterilization validation processes. Neurvana initially chose to pursue a plan for "standard process validation," but ran into problems.[13] Instead of proceeding with standard process validation, Neurvana determined to submit Titan for regulatory approval with another type of validation process called a "lot release."[14] Neurvana informed Balt USA of the difficulties it encountered with the pursuit of standard process validation for Titan and that it had determined to pursue a lot release system in the first instance.

In December 2017, after Neurvana informed Balt USA of the sterilization validation difficulties, Balt USA's Regulatory Vice President Charles Yang told

---

[12] Compl. ¶ 45.

[13] *Id.* ¶ 46.

[14] *Id.*

7

Fogarty that Balt USA could secure CE Mark approval within forty-five days. Yang based this representation on Balt USA's "superior relationship" with "DQS," a notified body in Europe with the authority to issue the CE Mark.[15] Plaintiff alleges that Ferrera and Girin had previously expressed a confidence similar to Yang's, as they boasted "good relationship[s]" with a DQS auditor.[16]

Ultimately, Balt USA proposed that the parties execute an agreement based on the terms of the Letter Agreement and Term Sheet, but that they do so with the understanding that they would immediately amend the agreement to transfer the obligation to obtain CE Mark approval to Balt USA. Although this obligation would be transferred to Balt USA, the amendment would preserve Neurvana's entitlement to the corresponding $250,000 milestone payment. Girin approved this proposal. Neurvana agreed.

### E.    The Asset Purchase Agreement

On December 21, 2017, Neurvana and Balt USA executed an Asset Purchase Agreement (the "Asset Purchase Agreement"). The Asset Purchase Agreement was consistent with the Letter Agreement and Term Sheet's economic terms and milestone payment structure. Like the Letter Agreement and Term Sheet, the Asset

---

[15] *Id.* ¶ 47.

[16] *Id.* ¶ 48.

8

Purchase Agreement assigned to Neurvana the responsibility to achieve regulatory milestones on or before September 30, 2018.[17]

As contemplated, however, the parties amended the Asset Purchase Agreement three weeks after it was executed, on January 12, 2018 (the "Amendment").[18] The Amendment required Neurvana to withdraw its CE Mark application and Balt USA to file its CE Mark application on or before February 11, 2018.[19] The Amendment also required that Balt USA use "Commercially Reasonable Efforts" to achieve the CE Mark Milestone on or before September 30, 2018.[20] This decision refers to the Asset Purchase Agreement as modified through the Amendment as the "Amended Agreement."

The Amended Agreement gives Balt USA "authority over all matters relating to [Titan] after the Closing," but requires that Balt USA exercise its authority in accordance with its "duty of good faith and fair dealing under applicable Law."[21]

The Amended Agreement also contains a "Further Assurances" provision requiring the parties, upon request, to "take, or cause to be taken, all such further or other actions as a Party may reasonably deem necessary or desirable in order to carry

---

[17] Compl. Ex. A § 1.06(b).

[18] Compl. Ex. B § 1.

[19] *Id.* § 4.

[20] *Id.*

[21] Compl. Ex. A § 1.06(d)(i)(4).

9

out the intent and accomplish the purposes of this Agreement."[22]  The Amended Agreement further prohibits Balt USA from taking "any action with the intent and purpose of reducing the Milestone Payments,"[23] and it includes an indemnification provision.[24]

### F. Balt USA Delays Expected CE Mark Approval to October 2018.

In the months following the execution of the Amended Agreement, Balt USA allegedly "failed to regularly communicate with Neurvana and kept Neurvana in the dark about its pursuit of Titan's CE Mark approval."[25]  Balt USA did submit its CE Mark application, but not until February 22, 2018, eleven days after the contractually imposed deadline of February 11.[26]  The day after Balt USA submitted its application, Yang expressed concern, allegedly "for the first time," about Titan's lot release sterilization method and the impact that method would have on the device's commercialization.[27]  Subsequently, Fogarty wrote to Girin twice—once on February 27, 2018, and once on March 6, 2018—to express Neurvana's willingness

---

[22] *Id.* § 4.07.

[23] *Id.* § 1.06(d)(i)(1).

[24] *Id.* § 5.03.

[25] Compl. ¶ 60.

[26] Amendment § 4.

[27] Compl. ¶ 62.

10

to work with Balt USA in order to resolve any perceived issues with Titan's sterilization validation process.

After a meeting between Balt USA and Neurvana on March 13, 2018, Yang wrote to Neurvana and made several representations, including that CE Mark approval was expected between mid-May and June 2018 and that the application had been submitted with a lot release protocol. Plaintiff alleges that, based on Balt USA's representation that it expected CE Mark approval within that timeframe, Neurvana "believed that Balt USA planned to launch Titan a few months later."[28] The Complaint notes that despite this, "Balt USA had not done anything to prepare for the launch, including ordering enough of the product, which required lead time of six to eight weeks."[29]

Simultaneously, Balt USA pursued another type of sterilization validation for Titan called "universal sterilization validation" and disclosed as much to Neurvana.[30] On May 18, 2018, Balt USA failed the universal sterilization validation for Titan. It planned for a new sterilization validation cycle to begin in June and end on September 17.

---

[28] *Id.* ¶ 66.

[29] *Id.*

[30] *Id.* ¶ 65.

11

On June 15, 2018, DQS contacted Balt USA with questions about the lot release sterilization validation that Balt USA had submitted with its initial CE Mark application. Balt USA informed DQS that it was in the process of completing a universal sterilization validation. In June 2018, Balt USA resubmitted its universal sterilization validation application to DQS.

On July 20, 2018, Balt USA decided to wait for Titan's universal sterilization validation to be completed in September before it resumed pursuit of CE Mark approval for Titan. Balt USA told DQS not to consider the Titan CE Mark application until it had successfully achieved universal sterilization validation. This delayed the expected approval date to October 2018. Plaintiff alleges that this decision "eliminated any chance that Titan would obtain CE Mark approval by the regulatory milestone date of September 30, 2018," thereby eliminating Balt USA's obligation to make the corresponding $250,000 milestone payment to Neurvana.[31] Balt USA informed Neurvana of its decision to wait for universal sterilization validation on August 13, 2018.

On August 21, 2018, Neurvana Chairman Jeff Goldberg—Ferrera's successor—wrote to Girin to formally express Neurvana's concerns with Balt USA's performance under the Amended Agreement. Specifically, Goldberg explained that Neurvana "relied on Balt's representations regarding its regulatory experience"

---

[31] *Id.* ¶ 72.

when it agreed to execute the Amendment and believed that commercially reasonable efforts had not been expended in that regard.[32] Goldberg further requested weekly phone calls until CE Mark approval was obtained. Balt USA did not respond.

Neurvana alleges that Balt USA's delay in obtaining CE Mark approval deprived it of the funds needed to secure 501(k) clearance from the FDA. Because Balt USA never made the CE Mark approval regulatory milestone payment owed under the Amended Agreement, Neurvana "no longer had adequate supplies of the product or the funding to continue to pursue approval."[33] As of the time the Complaint was filed, Neurvana had received no updates on the status of Titan's CE Mark application since August 2018.

### G. Neurvana Requests Indemnification Under the Amended Agreement.

By letter dated October 27, 2018, Neurvana notified Balt USA that it sought to invoke its indemnification rights under Section 5.03 of the Amended Agreement (the "Indemnification Notice").[34]

The Indemnification Notice cited several obligations imposed by the Amended Agreement perceived to have been breached or unfulfilled by Balt USA

---

[32] *Id.* ¶ 73.

[33] *Id.* ¶ 74.

[34] Compl. Ex. E.

13

in connection with the CE Mark approval process. Specifically, the Indemnification Notice alleged that Balt USA "has failed to abide by its assurances and promises to Neurvana, to consider requested options that would expedite the product launch, to obtain CE Mark approval using Commercially Reasonable Efforts, and to prepare for a reasonably timed launch using Commercially Reasonable Efforts."[35]

On November 30, 2018, Neurvana sent a second letter to Balt USA (the "Indemnification Follow-Up") stating that it "construe[d] Balt's failure to respond as a rejection of the indemnification claim" under the terms of the Amended Agreement.[36] The Indemnification Follow-Up further stated that Neurvana "remain[ed] willing to discuss [its indemnification claim] with Balt in good faith to resolve [the] dispute" within sixty days of the Indemnification Notice, as required by Section 5.05 of the Amended Agreement.[37] The parties did not reach a resolution within that sixty-day period, and as of the date the Complaint was filed, no indemnification agreement was reached.

---

[35] *Id.* at 3.

[36] Compl. Ex. F. Section 5.05(b) of the Amended Agreement provides: "If an Indemnifying Party does not accept the liability described in an Indemnification Claim Notice within the thirty (30) day period following receipt of such notice . . . such failure to so accept shall constitute a rejection of such claim by the Indemnifying Party." Compl. Ex. A § 5.05(b).

[37] Indemnification Follow-Up at 1. The Amended Agreement provides that, if the indemnification dispute is not resolved "us[ing] good faith efforts" within sixty days of the initial notice, the indemnification claim "shall be resolved" through litigation. Compl. Ex. A §§ 5.05(b), 7.13.

**H.    Ferrera Revokes an Alleged Licensing Agreement Between Balt USA and Neurvana in Early 2018.**

In 2017, while Ferrera was still Chairman of the Board, Ferrera twice assured the Board that Balt USA would license its "pusher" delivery device to Neurvana so that Neurvana could use it to develop another of its medical devices called "Dimension."[38]    Neurvana "made plans" based on these representations and "compensated Balt USA for the use of the pusher technology based on this agreement."[39]

On January 23, 2018, in response to an email sent by a Neurvana employee concerning the pusher delivery system, Ferrera stated: "[Girin] and I have discussed this matter.  Balt USA and Neurvana are separate companies.  We have no business relationship in terms of licensing any delivery system.  We suggest that Neurvana seek other means to [develop Dimension]."[40]    As Neurvana had been using Balt USA's pusher delivery system for months, Fogarty appealed to Girin for an interim solution while Neurvana secured a replacement.

On March 2, 2018, Ferrera emailed Fogarty and copied Girin.  In that email, Ferrera wrote that he "sought to clarify the apparent confusion over why Balt [USA]

---

[38] Compl. ¶¶ 78–79.

[39] *Id.* ¶ 79.

[40] *Id.* ¶ 80.

had stopped licensing its delivery system to Neurvana."[41] Ferrera denied the existence of any licensing agreement and claimed that "some prerequisite to the agreement had not occurred."[42]

### I. Neurvana Notifies Ferrera of Its Intent to Terminate the Consulting Agreement.

Several additional events that occurred throughout mid-to-late 2018 led Neurvana to terminate the Consulting Agreement with Ferrera.

On July 4, 2018, Ferrera wrote to the Board "out of the blue," in Plaintiff's words, to ask whether Neurvana had entered into an asset sale with a third party.[43] The Complaint alleges "[u]pon information and belief" that "Ferrera sent this email to probe the financial condition of Neurvana."[44]

On October 5, 2018, Ferrera demanded payment from Neurvana on behalf of Balt USA of approximately $265,000, claiming that Balt USA had covered certain of Neurvana's expenses totaling that amount from August 2016 to November 2017. Ferrera stated that if payment was not made within ten days, Balt USA would initiate collection proceedings and possibly litigation. Balt USA had "never before sought repayment of that purported debt."[45] Plaintiff alleges that Ferrera's demand and

---

[41] *Id.* ¶ 81.

[42] *Id.*

[43] *Id.* ¶ 86.

[44] *Id.*

[45] *Id.* ¶ 87.

threat of litigation constituted a breach of the Consulting Agreement, which prohibits Ferrera from using Neurvana's confidential information—including knowledge of Neurvana's "financial condition"—for "any purpose not expressly set forth" in the Consulting Agreement.[46]

The Complaint further alleges "[u]pon information and belief" that Ferrera "repeatedly disparaged Neurvana and its officers to investors, potential investors, members of [the Board], and other people and entities in the neuro-medical device industry, which impaired Neurvana's ability to raise capital . . . and further drove Neurvana into the ground."[47]

In light of these events, Neurvana believed that Ferrera was engaged in a "coordinated effort to not only deprive Neurvana of the benefit of the [Agreement], but to destroy the company completely for Ferrera's and Balt's benefit" and that Ferrera had breached the Consulting Agreement.[48] Neurvana thus notified Ferrera on December 26, 2018, that it was terminating the Consulting Agreement.[49] Because

---

[46] *Id.* ¶ 88; Consulting Agreement § 5(a).

[47] Compl. ¶ 85.

[48] *Id.* ¶¶ 88, 89.

[49] Consulting Agreement § 2(b) ("This Agreement may be terminated by the Company upon five (5) days written notice to Consultant in the event Consultant breaches this Agreement . . . .").

of this termination, Ferrera's LLC units were cancelled and forfeited under Neurvana's operative LLC Agreement.[50]

## J. This Litigation

Neurvana commenced this litigation on January 17, 2019. In its original form, the Complaint named four defendants—Balt USA, Balt International, Ferrera, and Girin (the "Original Defendants")—and asserted the following fourteen causes of action:

- Count[51] One for fraudulent inducement against Balt USA and Balt International;

- Count Two for equitable fraud or negligent misrepresentation against Balt USA and Balt International;

- Count Three for breach of contract against Balt USA and Balt International;

- Count Four for breach of the implied covenant of good faith and fair dealing against Balt USA and Balt International;

- Count Five for promissory estoppel against Balt USA and Balt International;

- Count Six for breach of the Consulting Agreement against Ferrera;

- Count Seven for breach of fiduciary duty against Ferrera;

- Count Eight for aiding and abetting breach of fiduciary duty against Girin;

---

[50] Compl. ¶ 89; Will Aff. Ex. 4 ("LLC Agreement").

[51] For clarity, this decision assigns a "Count" number to each of the fourteen causes of action asserted in the Complaint.

- Count Nine for tortious interference with prospective economic advantage against all Defendants;

- Count Ten for anticipatory repudiation against Balt USA and Balt International;

- Count Eleven for specific performance against Balt USA and Balt International;

- Count Twelve for alter ego liability against Balt USA and Balt International;

- Count Thirteen for indemnification against Balt USA; and

- Count Fourteen for declaratory judgment against Balt USA and Balt International.

On February 25, 2019, the Original Defendants filed a motion to dismiss the Complaint under Court of Chancery Rules 12(b)(2) and 12(b)(6).[52] The parties fully briefed the motion,[53] and the Court heard oral arguments on June 20, 2019.[54] On September 18, 2019, the Court issued a Memorandum Opinion dismissing Balt International from the case under Rule 12(b)(2) for lack of personal jurisdiction.[55] Balt International's dismissal had the practical effect of resolving all of Count

---

[52] Dkt. 20, Mot. to Dismiss the Verified Compl.

[53] Dkt. 28, Defs.' Opening Br. in Supp. of Their Mot. to Dismiss Pl.'s Verified Compl. ("Defs.' Opening Br."); Dkt. 35, Pl. Neurvana Medical LLC's Answering Br. in Opp'n to Defs.' Mot. to Dismiss Pl.'s Verified Compl. ("Pl.'s Answering Br."); Dkt. 39, Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss Pl.'s Verified Compl. ("Defs.' Reply Br.").

[54] Dkt. 43, Oral Arg. on Defs.' Mot. to Dismiss.

[55] Dkt. 44; *Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268 (Del. Ch. Sept. 18, 2019).

19

Twelve against Balt International for alter ego liability.[56]  In connection with the September 18 Memorandum Opinion, the Court requested that the parties make supplemental submissions concerning their theories for the Court's personal jurisdiction (or lack thereof) over Ferrera and Girin.[57]  The Court also held the Rule 12(b)(6) motion in abeyance pending receipt of those submissions.[58]  The parties completed their supplemental submissions on November 26, 2019.[59]

## II.   LEGAL ANALYSIS

Given the sprawling nature of the Complaint, this analysis begins by grouping each of the Counts into four categories.

The first category comprises claims specific to Ferrera and Girin based on Ferrera's status as a fiduciary: Count Seven for breach of fiduciary duty against Ferrera and Count Eight for aiding and abetting Ferrera's breach of fiduciary duty against Girin (the "Fiduciary Duty Claims").

---

[56] Count Twelve was initially asserted against Balt USA and Balt International, but is directed in substance to Balt International.  Compl. ¶¶ 166–70.  Specifically, Count Twelve alleges that Balt International, acting through Balt USA "fraudulently induced Neurvana to enter into the [Agreement] and Amendment in order to obtain the Titan catheters for less than fair value."  *Id.* ¶ 167.  Accordingly, Count Twelve is dismissed.

[57] Dkt. 45.

[58] *Id.*

[59] Dkt. 51, Defs.' Opening Suppl. Br. in Supp. of Their Mot. to Dismiss the Verified Compl.; Dkt. 53, Pl. Neurvana Medical LLC's Answering Br. in Opp'n to Defs.' Opening Suppl. Br. in Supp. of Their Mot. to Dismiss the Pl.'s Verified Compl.; Defs.' Suppl. Reply Br. in Further Supp. of Their Mot. to Dismiss the Verified Compl. ("Defs.' Suppl. Reply Br.").

20

The second category comprises contract claims against Balt USA: Count Three for breach of the Amended Agreement, Count Four for breach of the implied covenant of good faith and fair dealing, Count Five for promissory estoppel, Count Ten for anticipatory repudiation, Count Eleven for specific performance, Count Thirteen for indemnification, and Count Fourteen for declaratory relief (the "Contract Claims Against Balt USA").

The third category comprises a contract claim against Ferrera: Count Six for breach of the Consulting Agreement (the "Contract Claim Against Ferrera").

The fourth category comprises tort claims against various Defendants: Count One against Balt USA for fraudulent inducement, Count Two against Balt USA for equitable fraud or negligent misrepresentation, and Count Nine against all Defendants for tortious interference with prospective economic advantage (the "Tort Claims").

Ferrera and Girin have moved to dismiss the claims against them for lack of personal jurisdiction under Rule 12(b)(2). Under Rule 12(b)(2), "the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[60] In ruling on a 12(b)(2) motion, this Court may "consider the pleadings,

---

[60] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007) (citing *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318 (Del. Ch. 2003)).

21

affidavits and any discovery of record."[61]  "If, as here, no evidentiary hearing has been held, plaintiffs need only make a *prima facie* showing of personal jurisdiction and 'the record is construed in the light most favorable to the plaintiff.'"[62]

All Defendants have moved to dismiss all categories of claims under Rule 12(b)(6).  Under Rule 12(b)(6), the Court may grant a motion to dismiss if the complaint "fail[s] to state a claim upon which relief can be granted."[63]  "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[64]  When considering such a motion, the Court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[65]  The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in

---

[61] *Id.* (citing *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *3 (Del. Ch. Mar. 31, 2003)).

[62] *Id.* (first citing *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sept. 12, 1996) and then quoting *Cornerstone Techs.*, 2003 WL 1787959, at *3).

[63] Ct. Ch. R. 12(b)(6).

[64] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[65] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

favor of the non-moving party."[66]  Nor may a plaintiff point to what discovery might show to bolster its allegations.[67]

## A.      The Fiduciary Duty Claims and Personal Jurisdiction Issues

Plaintiff argues that the Court has jurisdiction over Ferrera under the Delaware LLC Act's implied consent provision codified at 6 *Del. C.* § 18-109.  Plaintiff further argues that jurisdiction over Girin is appropriate because he aided and abetted Ferrera's breach of fiduciary duty.  Because Plaintiff's Rule 12(b)(2) arguments hinge on the Rule 12(b)(6) analysis as to the Fiduciary Duty Claims, this section resolves the Rule 12(b)(2) motion and the Rule 12(b)(6) motion as to the Fiduciary Duty Claims together.

---

[66] *Price v. E.I. du Pont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[67] "The complaint generally defines the universe of facts that the trial court may consider in ruling on a 12(b)(6) motion to dismiss." *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (collecting cases).  Plaintiff's assertions that discovery will reveal facts to support its claims do not aid Plaintiff at the pleading stage. *See* Pl.'s Answering Br. at 24 ("Neurvana more than adequately alleged breach; why Balt's conduct was not commercially reasonable will be proven through discovery and expert testimony."); *id.* at 40 ("Discovery will show either that Defendants knew they were lying when they claimed that Balt could rapidly achieve [CE Mark approval] and fulfill the intent of the [Amended Agreement], or that they did not care if what they said was true."); *id.* at 58 ("Discovery will show both that third parties had shown interest in acquiring Neurvana's other products, and that the value of the [neuro]-medical devices increases exponentially after certain thresholds . . . are crossed.").

## 1.  Jurisdiction Over Ferrera

Section 18-109 of the Delaware LLC Act authorizes service of process on the managers of Delaware LLCs in certain types of proceedings:

> A manager . . . of a limited liability company may be served with process . . . in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited liability company or a violation by the manager . . . of a duty to the limited liability company.[68]

Defendants concede that because Ferrera served as Chairman of the Board until November 10, 2017, Ferrera is subject to this Court's jurisdiction under Section 18-109 for any breach of fiduciary duty allegedly committed while in that role.[69]  The question is thus whether the Court may exercise ancillary jurisdiction as to the remaining Counts against Ferrera—Count Six for breach of the Consulting Agreement and Count Nine for tortious interference with prospective economic advantage.

In both the corporate and alternative business entity contexts, "Delaware public policy favors Delaware courts assuming personal jurisdiction over parties in in order to adjudicate claims which sufficiently relate to other claims which do

---

[68] 6 *Del. C.* § 18-109(a).

[69] Def.'s Reply Br. at 6 ("Defendants acknowledge that Plaintiff's breach of fiduciary duty [claim] against Ferrera falls under the statute.").  *But see id.* at 7 n.4 (arguing that Section 18-109 does not "create personal jurisdiction for conduct after Ferrera resigned").

properly bring the party within those courts' jurisdiction."[70] Once a fiduciary is properly subject to jurisdiction for a claim of breach of fiduciary duty, "the trial court may also subject that fiduciary to personal jurisdiction for claims that are 'sufficiently related' or '[not] distantly related' to the breach of fiduciary duty claim."[71] Whether the non-fiduciary duty claims are "sufficiently related" to the fiduciary duty claim "depends on whether the claims arise out of the 'same nucleus of operative facts.'"[72] Further, a claim may be "adequately alleged to be 'sufficiently related'"[73] for the purpose of ancillary jurisdiction despite its failure to state a claim under Rule 12(b)(6).[74]

---

[70] *Fitzgerald v. Chandler*, 1999 WL 1022065, at *4 (Del. Ch. Oct. 14, 1999).

[71] *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 292 n.63 (Del. 2016). Although *Hazout* involved an application of 10 *Del. C.* § 3114, this Court has recognized that it "often looks to analogies in the corporate law for guidance on similar issues involving alternative business entities." *Fitzgerald*, 1999 WL 1022065, at *4.

[72] *Canadian Commercial Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *11 (Del. Ch. Feb. 22, 2006) (quoting *Hovde Acq., LLC v. Thomas*, 2002 WL 1271681, at *4 n.16 (Del. Ch. June 5, 2002)).

[73] *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 2006 WL 2588971, at *1 (Del. Ch. Sept. 1, 2006).

[74] *Id.* at *7 n.73 ("[T]hat the averments fail to state a claim upon which relief can be granted does not determine whether the Court has personal jurisdiction with respect to any claim, as an initial matter."). *Cf. Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *13 (Del. Ch. Nov. 21, 1995) ("The ability of a shareholder to invoke Section 3114 cannot turn upon whether the facts allege[d] constitute a valid claim. If they do not, the director may have the case dismissed on its merits under Rule 12(b)(6), not under Rule 12(b)(2) . . . ."); *Bell v. Hood*, 327 U.S. 678, 682 (1946) ("[I]t is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.").

Ferrera argues that the non-fiduciary claims against him are not sufficiently related to the fiduciary duty claim because they address conduct occurring after Ferrera resigned from his fiduciary position.[75] This argument rests on a flawed premise—that Ferrera cannot be liable for breach of fiduciary duty for actions taken after he ceased being a fiduciary.[76] While generally "former directors owe no fiduciary duties,"[77] Delaware law recognizes limited exceptions to this rule. "A former director, of course, breaches his fiduciary duty if he engages in transactions that had their inception before the termination of the fiduciary relationship or were founded on information acquired during the fiduciary relationship."[78] Plaintiff invokes this exception, alleging that Ferrera breached his fiduciary duties by using confidential information and knowledge that he acquired before his resignation to harm Neurvana.[79]

---

[75] Defs.' Suppl. Reply Br. at 4.

[76] *Id.*

[77] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 658 (Del. Ch. 2005).

[78] *BelCom, Inc. v. Robb*, 1998 WL 229527, at *3 (Del. Ch. Apr. 28, 1998) (emphasis removed); *see also Seiden v. Kaneko*, 2015 WL 7289338, at *11 (Del. Ch. Nov. 3, 2015) (recognizing that a former director continued to owe fiduciary duties to his former company where the director continued to serve as a director or officer of an affiliate and continued to have access to the former company's confidential information post-resignation).

[79] Compl. ¶ 139 (alleging that Ferrera was "repeatedly disparaging Neurvana to investors and other members of the neuro-medical industry, using confidential information to undermine Neurvana's product development, arbitrarily rescinding an agreement to license a device that would allow for further product development, delaying Titan's pursuit of CE Mark approval, failing to prepare for the launch of Titan, and demanding repayment of

Plaintiff's claims against Ferrera for breach of the Consulting Agreement and for tortious interference with prospective economic advantage are sufficiently related to this aspect of the claim for breach of fiduciary duty such that ancillary jurisdiction is appropriate in this case. At their core, the additional claims against Ferrera center on Ferrera's alleged "ongoing efforts . . . to sabotage and destroy" Neurvana through non-performance of the Amended Agreement and other conduct designed to impair Neurvana's value.[80] The Complaint alleges that, "[i]n support of these efforts, Ferrera has violated his [C]onsulting [A]greement with Neurvana . . . by using Neurvana's confidential information to Neurvana's detriment."[81] The Consulting Agreement was a byproduct of Ferrera's resignation from the Board, and it prohibited Ferrera from using any confidential information he acquired during the fiduciary relationship.[82] Ferrera's alleged breach of this confidentiality obligation forms one of the bases for Plaintiff's breach of fiduciary duty claim.[83]

The Complaint further alleges that Ferrera's "ouster" from the Board[84] prompted Ferrera to take nefarious actions designed in part to "intentionally

---

over $264,000 in October 2018 in an attempt to further cripple Neurvana using his knowledge of Neurvana's financial vulnerability"); *see also* Pl.'s Answering Br. at 50–51.

[80] Compl. ¶ 1.

[81] *Id.* ¶ 2.

[82] *Id.*

[83] *Id.* ¶¶ 138–39.

[84] *Id.* ¶ 2.

interfere[] with the development of Lumenate and Dimension."[85]  Such alleged actions included using confidential information he acquired in his capacity as manager of Neurvana to "undermine Neurvana's product development"[86] and demanding repayment of a substantial debt "in an attempt to further cripple Neurvana using knowledge of Neurvana's financial vulnerability," which he also acquired in his capacity as manager.[87]  These alleged actions form additional bases for Plaintiff's breach of fiduciary duty claim against Ferrera.[88]

As alleged, therefore, Plaintiff's claims against Ferrera for breach of the Consulting Agreement and for tortious interference with prospective economic advantage are sufficiently related to Plaintiff's claim against Ferrera for breach of fiduciary duty.  Thus, the exercise of ancillary jurisdiction over Count Six and Count Nine, as asserted against Ferrera, is appropriate.

### 2. Jurisdiction Over Girin

"[A]iding and abetting claims represent a context-specific application of civil conspiracy law."[89]  The Delaware Supreme Court established the elements of the conspiracy theory of jurisdiction in *Istituto Bancario SpA v. Hunter Engineering Co.*:

---

[85] *Id.* ¶ 150.

[86] *Id.* ¶ 151.

[87] *Id.*

[88] *Id.* ¶ 139.

[89] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006).

> A conspirator who is absent from the forum state is subject to the jurisdiction of the court . . . if the plaintiff can make a factual showing that (1) a [tortious conspiracy] existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[90]

"Delaware courts construe this test narrowly and require a plaintiff to assert specific facts, not conclusory allegations, as to each element."[91]  "Sufficiently pleading a claim for breach of fiduciary duty and a related claim for aiding and abetting a breach of fiduciary duty satisfies the first and second elements of the *Istituto Bancario* test."[92]  The threshold questions are thus (a) whether Plaintiff has sufficiently pleaded a claim for breach of fiduciary duty against Ferrera, and if so, (b) whether Plaintiff has sufficiently pleaded a claim for aiding and abetting breach of fiduciary duty against Girin.

---

[90] *Perry v. Neupert*, 2019 WL 719000, at *22 (Del. Ch. Feb. 15, 2019) (quoting *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225 (Del. 1982)).

[91] *Hartsel v. Vanguard Gp., Inc.*, 2011 WL 2421003, at *10 (Del. Ch. June 15, 2011) (citing *Werner v. Miller Tech. Mgmt., L.P.,* 831 A.2d 318, 329–30 (Del. Ch. 2003)).

[92] *Virtus Capital, L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *13 (Del. Ch. Feb. 11, 2015) (citing *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 583828, at *7 (Del. Ch. Feb. 4, 2005)).

### a. Count Seven States a Claim for Breach of Fiduciary Duty Against Ferrera.

Count Seven of the Complaint alleges that Ferrera breached his fiduciary duty to Neurvana. The Complaint alleges that, while serving as Chairman, Ferrera "owed Neurvana ongoing fiduciary duties of loyalty, good faith, and care."[93] As discussed above, the Complaint further alleges that Ferrera was obligated after his resignation as Chairman not to use information obtained in the fiduciary relationship to harm Neurvana.[94] Although the LLC Agreement does not eliminate default fiduciary duties,[95] it does exculpate managers from liability for breaches of the duty of care.[96] The practical effect of the exculpation provision is that to state a claim for breach of fiduciary duty, Plaintiff must plead a reasonably conceivable basis for this Court to infer that Ferrera breached his duty of loyalty or otherwise acted in bad faith.

Where a Complaint alleges breach of the fiduciary duty of loyalty, "a plaintiff can survive a motion to dismiss . . . by pleading facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to

---

[93] Compl. ¶ 136.

[94] *See supra* Section II.A.1.

[95] *See generally* LLC Agreement art. V.

[96] *Id.* § 5.4(b) (providing that "[n]o Member, Manager or Officer shall be liable, responsible or accountable in damages or otherwise to [Neurvana] or to any other Member for . . . any act performed in good faith on behalf of [Neurvana] and in a manner reasonably believed to be within the scope of authority conferred on the Member, Manager or Officer . . . except for the gross negligence or willful misconduct of the Member, Manager or Officer").

advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[97] Bad faith may be demonstrated where "the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[98]

The Complaint adequately alleges that Ferrera breached his duty of loyalty and acted in bad faith while serving as Chairman. The Complaint alleges that Ferrera served as President and COO of Balt USA while he negotiated the Term Sheet and Letter Agreement on behalf of Neurvana. Despite this dual role, Ferrera "inserted himself" into negotiations with Balt USA rather than distancing himself from the process.[99] Ferrera went so far as to "push[] for his long-time counsel to work on the deal during initial negotiations over the deal term sheet."[100] Members of the Board were concerned that Ferrera failed to negotiate in Neurvana's best interests and believed that Ferrera's lawyer was soft on multiple terms, including with respect to

---

[97] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015).

[98] *Stone*, 911 A.2d at 369 (quoting *Disney*, 906 A.2d at 67).

[99] Compl. ¶ 33.

[100] *Id.* ¶ 35.

the milestone earn-out structure adopted in the Amended Agreement, which contemplated an up-front payment of a small fraction of the total possible consideration—$250,000 of $16 million.[101] These allegations make it reasonably conceivable that Ferrera was acting for a purpose "other than that of advancing the best interests of the corporation"[102] and thus breached his duty of loyalty and good faith.

The Complaint also alleges that Ferrera breached his fiduciary duties to Neurvana after he resigned from the Board by using Neurvana's confidential information to harm Neurvana. Specifically, the Complaint alleges that Ferrera

> [1] repeatedly disparag[ed] Neurvana to investors and other members of the neuro-medical industry, [2] us[ed] confidential information to undermine Neurvana's product development, [3] arbitrarily rescind[ed] an agreement to license a device that would allow for further product development, [4] delay[ed] Titan's pursuit of CE Mark approval, [5] fail[ed] to prepare for the launch of Titan, and [6] demand[ed] repayment of over $264,000 in October 2018 in an attempt to further cripple Neurvana using his knowledge of Neurvana's financial vulnerability.[103]

As discussed above, "[a] former director . . . breaches his fiduciary duty if he engages in transactions that had their inception before the termination of the

---

[101] *Id.* ¶¶ 35, 50.

[102] *Stone*, 911 A.2d at 369 (quoting *Disney*, 906 A.2d at 67).

[103] Compl. ¶ 139; Pl.'s Answering Br. at 50–51.

32

fiduciary relationship or were founded on information acquired during the fiduciary relationship."[104] Of the six alleged ways Ferrera breached his fiduciary duties post-resignation, however, none fit this description. Plaintiff does not allege that Ferrera engaged in a transaction that had its inception before his resignation. Although Plaintiff alleges in a conclusory fashion that Ferrera used "his knowledge of Neurvana's financial vulnerability" in engaging in these activities,[105] Plaintiff does not plead facts to support this assertion. The notion fails at a high level, as it is not reasonable to infer that any knowledge of Neurvana's vulnerability was only attained by Ferrera in his fiduciary capacity. A closer examination of the six allegations supports this conclusion.

Four of these post-resignation allegations form the bases for the Contract Claim Against Ferrera.[106] As discussed below, however, these allegations are conclusory, lacking in well-pleaded factual support, and insufficient to state a claim

---

[104] *BelCom*, 1998 WL 229527, at *3.

[105] Compl. ¶ 139.

[106] *See infra* Section II.C. Plaintiff alleges that Ferrera breached the Consulting Agreement by "us[ing] confidential information to harm and undermine Neurvana's development and prospective business relations" when he caused Balt USA to "revoke Neurvana's license to use Balt's 'pusher' delivery-system" and "demanded immediate payment of over $264,000." Compl. ¶ 132; Pl.'s Answering Br. at 54. Plaintiff also alleges that Ferrera breached the Consulting Agreement by "repeatedly disparag[ing] Neurvana and its officers to investors . . . and other people and entities in the neuro-medical industry." Compl. ¶ 133.

for breach of the Consulting Agreement.[107]  For the same reasons, they are insufficient to state a claim for breach of fiduciary duty.

The remaining two allegations—that Ferrera "delay[ed] Titan's pursuit of CE Mark approval" and "fail[ed] to prepare for the launch of Titan"[108] using Neurvana's confidential information or his knowledge of Neurvana's financial vulnerability— are also conclusory and unsupported by well-pleaded facts in the Complaint.  The Complaint contains no allegation that Ferrera was even marginally involved with the CE Mark approval process after his resignation from the Neurvana Board.[109]  Rather, the Complaint alleges only that Yang, Girin, and Fogarty participated in or communicated about that process.[110]  Similarly, the Complaint contains no allegation that Ferrera was involved with Balt USA's preparation for the launch of Titan.

---

[107] *See infra* Section II.C.

[108] Compl. ¶ 139.

[109] *Id.* ¶¶ 59–76.

[110] *E.g.*, *id.* ¶ 59 (alleging that Yang suggested the ultimately agreed-upon plan that Balt would obtain accelerated CE Mark approval and that Girin approved this plan); *id.* ¶ 62 ("On February 23, the Neurvana team received an email from Charles Yang, which noted that Balt USA had submitted Titan's CE Mark application."); *id.* ¶ 63 ("On February 27, Tom Fogarty wrote to Girin to report that the parties' respective regulatory employees, Charles Yang and Nate Knock, had found some common ground . . . ." (internal quotation marks omitted)); *id.* ("The next day, Fogarty wrote again to clarify that the Neurvana team members stood ready to resolve any sterilization challenges and 'can help' if Yang is 'resource constrained' . . . ."); *id.* ¶ 64 ("On March 6, Fogarty wrote to Girin to again offer Neurvana's help . . . ."); *id.* ¶ 65 ("After a meeting between the Balt USA and Neurvana teams on March 13, Yang wrote to the Neurvana team to confirm Balt's plan to secure CE Mark approval . . . ."); *id.* ¶ 66 ("Shortly thereafter, Fogarty reached out again to Girin to offer Neurvana's help with a market forecast based on the interim sterilization plan.").

In sum, Plaintiff has sufficiently stated a claim against Ferrera for breach of fiduciary duty concerning his pre-resignation conduct, but has failed to state a claim for the same concerning Ferrera's post-resignation conduct. One consequence of this conclusion is that Defendants' motion to dismiss Count Seven of the Complaint pursuant to Rule 12(b)(6) is denied. Another consequence of this conclusion is that the Complaint sufficiently pleads the first essential element for asserting personal jurisdiction over Girin.

### b. Count Eight Fails to State a Claim for Aiding and Abetting Breach of Fiduciary Duty Against Girin.

Count Eight of the Complaint alleges that Girin aided and abetted Ferrera's breach of fiduciary duty. Plaintiff does not assert Count Eight against Balt USA. A party is liable for aiding and abetting when he knowingly participates in any fiduciary breach.[111] An aider and abettor knowingly participates in a breach when he acts "with the knowledge that the conduct advocated or assisted constitutes such

---

[111] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del. 1995) ("A claim for aiding and abetting requires the following three elements: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) a knowing participation in that breach by [the non-fiduciary]."); *see RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 861–62 (Del. 2015).

a breach."[112]  This standard requires well-pleaded facts that the aider and abettor

acted with "scienter," or "knowingly, intentionally or with reckless indifference."[113]

As discussed above, Plaintiff has stated a claim against Ferrera for breach of

fiduciary duty relating to his pre-resignation conduct in negotiating the Letter

Agreement and Term Sheet.  But there are no facts in the Complaint allowing for the

rational inference that Girin knowingly participated in this breach, as the Complaint

does not allege that Girin was involved in those negotiations or that Girin and Ferrera

ever communicated throughout that period.[114]

The aspect of Plaintiff's breach of fiduciary duty claim relating to Ferrera's

post-resignation conduct does not survive Defendants' motion.  But even assuming

that a predicate breach of fiduciary duty occurred *after* Ferrera resigned from the

Neurvana Board, the Complaint does not contain non-conclusory allegations

concerning Girin's knowing participation in that breach.  Aside from the allegation

that Girin and Ferrera were simultaneously employed by Balt USA after Ferrera

resigned from the Neurvana Board, the only allegation tying Girin to Ferrera's post-

---

[112] *In re Rural Metro Corp.*, 88 A.3d 54, 97 (Del. Ch. 2014) (citation and internal quotation marks omitted); *see also In re Comverge, Inc. S'holders Litig.*, 2014 WL 6686570, at *18 (Del. Ch. Nov. 25, 2014) (explaining that knowing participation "requires an understanding between the parties with respect to their complicity").

[113] *Mesirov v. Enbridge Energy Co.*, 2018 WL 4182204, at *13 (Del. Ch. Aug. 29, 2018) (citing, *Jervis*, 129 A.3d at 862).

[114] *See* Compl. ¶¶ 33–35.

resignation conduct is an email from Ferrera to Fogarty, stating: "Pascal [Girin] and I have discussed this matter. . . . We have no business relationship in terms of licensing any delivery system."[115]  This allegation is insufficient to constitute "knowing participation" in fiduciary breach.  That Ferrera and Girin were co-officers of Balt USA and may have "discussed" the alleged licensing agreement does not provide a reasonably conceivable basis to conclude that Girin acted with the sort of "scienter" necessary for a finding of knowing participation in fiduciary breach.[116]

Thus, the Complaint fails to plead the second essential element for asserting personal jurisdiction over Girin, and Girin's motion to dismiss pursuant to Rule 12(b)(2) is granted.

## B.    The Contract Claims Against Balt USA

Count Three of the Complaint claims that Balt USA breached the express terms of the Amended Agreement.  Count Four asserts that Balt USA breached the implied covenant of good faith and fair dealing.  Count Five asserts a claim for promissory estoppel.  Count Ten asserts a claim for anticipatory repudiation.  Count Thirteen asserts a claim for indemnification.  And Count Eleven and Fourteen seek specific performance and declaratory relief, respectively.

---

[115] *Id.* ¶ 66.

[116] *Mesirov*, 2018 WL 4182204, at *13.

### 1. Count Three Fails to State a Claim for Breach of the Amended Agreement.

Plaintiff claims that Balt USA breached four express provisions of the Amended Agreement, by (a) failing to use Commercially Reasonable Efforts to obtain CE Mark approval for Titan, in violation of Sections 1.06 and 4.06; (b) failing to provide Neurvana with Further Assurances, in violation of Section 4.07; (c) failing to submit its CE Mark application by the contractually specified deadline of February 11, 2018, in violation of Section 4.06; and (d) failing to make the milestone payments, in violation of Section 1.06.[117]

"To establish a breach of contract claim, a party must prove: (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) damages that the plaintiff suffered as a result of the breach."[118] Delaware courts follow the objective theory of contracts, giving words "their plain meaning unless it appears that the parties intended a special meaning."[119] The objective theory of contracts requires that a court "give priority to the parties' intentions as reflected in

---

[117] Pl.'s Answering Br. at 20–22.

[118] *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *6 (Del. Ch. Nov. 19, 2013) (citing *Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *19 (Del. Ch. Oct. 10, 2006)); *see also VLIW Techs., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[119] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104 (Del. 2013) (citing *AT & T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008)); *see also Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) ("A contract's construction should be that which would be understood by an objective, reasonable third party." (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010))).

38

the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[120]

### a. Commercially Reasonable Efforts

Section 1.06(d)(i)(4) of the Amended Agreement vests Balt USA with the sole discretion and authority post-closing to make decisions concerning "all matters relating to" Titan.[121] This discretion is limited by Balt USA's obligations to use "Commercially Reasonable Efforts" to achieve the CE Mark Milestone as provided in Sections 4.06(b) of the Amended Agreement.[122]

Efforts standards like that imposed by the Amended Agreement are common.[123] Typical forms of efforts clauses require "good faith efforts,"

---

[120] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (citing *Salamone*, 106 A.3d at 368).

[121] Compl. Ex. A § 1.06(d)(i)(4) ("The Purchaser shall have authority over all matters relating to the Milestone Products after the Closing, including, but not limited to, any research, development, manufacturing, Commercialization, clinical trial design, site selection, regulatory, quality standards, legal, intellectual property rights, marketing, licensing and sales decisions relating to the Milestone Products.").

[122] As amended, Section 4.06(b) provides that Balt USA "shall and shall cause its Affiliates to use Commercially Reasonable Efforts to achieve the CE Mark Milestone." Amendment § 4. Similarly, Section 1.06(d)(i)(2) requires Balt USA to "use Commercially Reasonable Efforts to Commercialize the Milestone Products in the applicable market(s) in which the applicable regulatory approval(s) that is/are the subject of the Regulatory Milestone(s) was/were achieved." Compl. Ex. A § 1.06(d)(i)(2).

[123] *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *86 (Del. Ch. Oct. 1, 2018) ("In acquisition transactions, the parties will generally bind themselves to achieve specified results with respect to activities that are within their control . . . and reserve [an efforts] standard for things outside of their control or those dependent upon the actions of third parties." (quoting Lou R. Kling & Eileen T. Nugent, 2 Negotiated Acquisitions of

"commercially reasonable efforts," "reasonable efforts," "reasonable best efforts,"

and "best efforts."[124]  "Deal practitioners have a general sense of a hierarchy of

efforts clauses,"[125] but "[c]ommentators who have surveyed the case law find little

support for the distinctions that transactional lawyers draw."[126]  This Court has

"wrestled" with the meaning of efforts clauses on many occasions,[127] ascribing

default meanings to efforts clauses where the parties failed to contractually set

one.[128]

---

Companies, Subsidiaries and Divisions § 13.06 (2019)), *aff'd*, 198 A.3d 724 (Del. 2018) (TABLE).

[124] *Id.* at *86–87 (identifying the five efforts clauses and explaining the meaning ascribed to each by the ABA Committee on Mergers and Acquisitions); *see* Ryan Aaron Salem, *An Effort to Untangle Efforts Standards Under Delaware Law*, 122 Penn St. L. Rev. 793, 799–803 (2018) (listing several "variant[s]" of efforts standards used by contractual parties).

[125] *Akorn*, 2018 WL 4719347, at *86.

[126] *Id.* at *87.

[127] *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *7 & n.83 (Del. Ch. Dec. 28, 2018) (collecting cases).

[128] *See, e.g.*, *Williams Cos. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 (Del. 2017) (construing contractual clauses requiring the parties to use undefined "reasonable best efforts" and "commercially reasonable efforts" as placing "an affirmative obligation on the parties to take all reasonable steps" to accomplish contractual objectives); *Akorn*, 2018 WL 4719347, at *46, 87 (construing a contractual clause requiring the plaintiff to use undefined "commercially reasonable efforts" as requiring the plaintiff to "'take all reasonable steps' to maintain its operations in the ordinary course of business" (quoting *Williams*, 159 A.3d at 272)).  *Cf.* Kenneth A. Adams, *Understanding "Best Efforts" and Its Variants (Including Drafting Recommendations)*, 50 Prac. Law. 11, 14 (2004) (commenting that "case law on the meaning of *best efforts* suggests that instead of representing different standards, other *efforts* standards mean the same thing as *best efforts*, *unless a contract definition provisions otherwise* (emphasis added)).

In this case, the parties agreed to a definition of Commercially Reasonable Efforts in Section 6.01 of the Amended Agreement:

> activities using efforts and resources comparable to those which an entity in the medical device industry of similar resources and expertise as the Purchaser and its Affiliates (taken as a whole) generally use in the exercise of its reasonable business judgment to accomplish such activities and objectives in an expeditious manner for its own products . . . of similar market potential at a similar stage in development or product life, considering conditions then prevailing.[129]

Section 6.01 then goes on to list several factors to consider when applying this definition.[130] Provisions like Section 6.01 impose an objective "outward facing definition," which "applies an industry-standard requirement or looks to other participants in the industry to define the diligence obligations of the buyer."[131] Such provisions create a "standard based on the effort that companies similarly situated in the market employ, or would employ."[132] These provisions are viewed as seller-

---

[129] Compl. Ex. A § 6.01.

[130] *Id.* (listing several considerations to be "tak[en] into account, without limitation," including issues of safety, efficacy, expected and actual cost of development, profitability, competitiveness of third-party products, market exclusivity, and "all other relevant scientific, technical, commercial, and other factors").

[131] Kristian A. Werling & Richard B. Smith, *"Commercially Reasonable Efforts" Diligence Obligations in Life Science M&A (Mergers and Acquisitions)*, Nat. L. Rev. (May 29, 2014), https://www.natlawreview.com/article/commercially-reasonable-efforts-diligence-obligations-life-science-ma-mergers-and-ac.

[132] *Himawan*, 2018 WL 6822708, at *1 (considering a clause that defined "commercially reasonable efforts" as "the exercise of such efforts and commitment of such resources by a company with substantially the same resources and expertise as [the buyer]" and

41

friendly, as they allow the seller, when attempting to plead or prove that the buyer has breached its obligations, to point to an objective metric—comparable industry standards—rather than the buyer's subjective intent or state of mind.[133]

Despite the seller-friendly nature of Section 6.01's efforts standard, the Complaint fails to plead any facts that could conceivably support a claim for breach of that standard. The Complaint does not identify a single "entity in the medical device industry of similar resources and expertise as" Balt USA.[134] Nor does it identify what activities such an entity would "generally use in the exercise of its reasonable business judgment to accomplish such activities and objectives in an expeditious manner for its own products."[135] And the Complaint does not identify any "products . . . of similar market potential at a similar stage in development or product life" as Titan.[136] Notably, Plaintiff does not attempt to plead any such facts in even a conclusory fashion. Plaintiff alleges that Balt USA told DQS to stop processing Titan's CE Mark application until after it had successfully achieved

---

commenting that it appeared to create a "standard based on the effort that companies similarly situated in the market employ, or would employ").

[133] *See* Werling & Smith, *supra* note 131 (commenting that outward facing definitions are "generally viewed as more favorable to the seller of a technology, as it enables the seller to point to other industry standards that would have the buyer take additional steps to achieve the goal that would result in a payout on the earnout").

[134] Compl. Ex. A § 6.01.

[135] *Id.*

[136] *Id.*

universal sterilization validation, but alleges nothing to suggest that Balt USA's approach stopped short of Commercially Reasonable Efforts in pursuing sterilization validation as defined in Section 6.01.[137]

The allegations in this action contrast with those made in *Himawan*, where Vice Chancellor Glasscock interpreted a nearly identical, outward facing commercially reasonable efforts provision.[138] The merger agreement in *Himawan* was similar in form to the Amended Agreement in that it: provided an up-front payment and post-closing earn-out structure; gave the acquirer complete discretion over business decisions relating to the surviving company; and obligated the acquirer to use "commercially reasonable efforts" to develop and commercialize the antibody it was acquiring.[139] The plaintiffs alleged that the defendant failed to use commercially reasonable efforts to develop and commercialize the antibody, where the merger agreement defined "commercially reasonable efforts" as "the exercise of such efforts and commitment of such resources by a company with substantially the same resources and expertise as [the acquirer], with due regard to the nature of efforts and cost required for the undertaking at stake."[140] The defendants moved to dismiss the claim.

---

[137] Pl.'s Answering Br. at 21–22.

[138] 2018 WL 6822708, at *3.

[139] *Id.* at *34.

[140] *Id.* at *3.

In denying the motion to dismiss, Vice Chancellor Glasscock observed that the plaintiffs had pleaded at least some facts tying to the "relevant yardstick" supplied by the contractual commercially reasonable efforts provision.[141] The plaintiffs pointed to "several companies with substantially the same resources and expertise as [the acquirer]" that were "working to develop treatments" for the relevant disease.[142] The Court concluded that these allegations, scant as they were, supported the reasonable inference that the defendant failed to satisfy the contractual standard.[143] By contrast, Plaintiff in this case made *no* effort to apply the "relevant yardstick" supplied by Section 6.01 of the Amended Agreement.

Rather than plead facts regarding similar entities or similar products in similar stages of development, the Complaint focuses primarily on Balt USA's interactions with Plaintiff. The Complaint alleges that Balt USA "turned down Neurvana's offers to help" with regulatory approval, "promised to continue to pursue lot release" in its CE Mark application and then "reneged" on that alleged promise to Neurvana, and "failed to keep Neurvana informed" about the CE Mark approval process or communications with DQS.[144]

---

[141] *Id.* at *8.

[142] *Id.*

[143] *Id.*

[144] Pl.'s Answering Br. at 21–22.

None of Plaintiff's allegations, standing alone or taken collectively, create the reasonable inference that Balt USA breached the objective Commercially Reasonable Efforts standard set forth in Section 6.01. These allegations demonstrate nothing more than that Balt USA did not want Plaintiff's involvement or that Plaintiff disagreed with Balt USA's regulatory strategy—a strategy Balt USA was contractually entitled to undertake.[145] The Complaint fails to allege facts making it reasonably conceivable that Balt USA failed to use Commercially Reasonable Efforts to timely submit and obtain CE Mark approval.[146]

---

[145] Compl. Ex. A § 1.06(d)(i)(4). *Cf. GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *5 (Del. Ch. June 21, 2012) ("If a contract specifically contemplates that a party *may* take action, . . . and then the party takes that action in full accordance with its attendant obligations, there is no proper basis to conclude that the party has breached the contract by doing what the objective terms of the contract authorize." (emphasis added) (citing *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *1 (Del. Ch. Nov. 8, 2007))).

[146] Compl. ¶ 114. For the same reasons, the Complaint also fails to allege facts making it reasonably conceivable that Balt USA failed to use Commercially Reasonable Efforts to commercialize Titan under Section 1.06(d)(i)(2). This argument additionally fails because the Commercial Milestone Efforts Period throughout which Balt USA was required to use Commercially Reasonable Efforts to commercialize Titan never commenced. *See* Compl. Ex. A § 1.06(d)(i)(2) ("During the Commercial Milestone Efforts Period, [Balt USA] shall use Commercially Reasonable Efforts to Commercialize [Titan] in the applicable market(s) in which *the applicable regulatory approval(s) . . . was/were achieved*." (emphasis added)); *id.* § 1.06(a)(i) (defining "Commercial Milestone Efforts Period" as the period "commencing on the earliest to occur of the date (1) the Purchaser receives notice that a CE mark may be lawfully affixed to one or both Titan Products . . . or (2) the Seller receives notice of 510(k) clearance from the FDA").

### b. Further Assurances

Section 4.07 of the Amended Agreement provides that, "as and when requested" by Plaintiff, Balt USA must "take . . . all such further or other actions as a Party may reasonably deem necessary or desirable in order to carry out the intent and accomplish the purposes of this Agreement."[147]

Because Plaintiff has not adequately alleged that Balt USA breached the Commercially Reasonable Efforts provision, Plaintiff effectively argues that Section 4.07 imposes a more onerous obligation, which Balt USA breached. Plaintiff dedicates but one paragraph of its brief to this claim.[148] In that paragraph, Plaintiff does not point to a single allegation in the Complaint concerning Balt USA's failure to take actions that may be reasonably deemed necessary or desirable to carry out the intent and accomplish the purposes of the Amended Agreement. Instead, Plaintiff argues that the sufficiency of Balt USA's efforts to obtain CE Mark approval "are factual determinations for trial."[149] This non sequitur does nothing at the pleading stage to aid Plaintiff in satisfying its burden of demonstrating a reasonable conceivability that Balt USA breached Section 4.07.

---

[147] Compl. Ex. A § 4.07.

[148] Pl.'s Answering Br. at 26.

[149] *Id.*

46

### c.      CE Mark Application Deadline

Section 4.06(b) of the Amended Agreement provides that, "[o]n or before February 11, 2018 . . . [Balt USA] will file an application for approval that a CE mark may be lawfully affixed to" Titan.[150]  Plaintiff argues that Balt USA breached the Amended Agreement by failing to submit its CE Mark application by the contractually mandated deadline of February 11, 2018.   But the Complaint acknowledges that Balt USA eventually filed its CE Mark application on February 22, 2018,[151] and Plaintiff pleads no facts suggesting that this delay of eight business days caused it to suffer damages.[152]

### d.      Milestone Payments

Section 1.06(b) of the Amended Agreement provides that Balt USA "shall pay (or cause to be paid) to the Seller, in accordance with and subject to the terms of this Section 1.06, the following payments . . . upon the achievement of the following milestone events."[153]   Sections 1.06(b)(i) and 1.06(b)(ii) then list the "Regulatory

---

[150] Amendment § 4.

[151] Compl. ¶ 61.

[152] To the contrary, Plaintiff alleges that independent events other than the eight-day delay were the cause of Plaintiff's alleged damages: "[A]lthough the initial application was 'only' eight days late, Neurvana alleges several additional unexplained delays, and Balt later withdrew the [CE Mark] application entirely to pursue universal sterilization instead, *which meant that the milestone deadline would not be met . . . .*"  Pl.'s Answering Br. at 27 (emphasis added).

[153] Compl. Ex. A § 1.06(b).

Milestones" and "Commercial Milestones" and their corresponding milestone payments.[154]

Plaintiff alleges that Balt USA breached the Amended Agreement by failing to make the regulatory and commercial milestone payments required under Section 1.06(b). Plaintiff does not allege that any of the milestone events triggering Balt USA's milestone payment obligations actually occurred—indeed, the non-occurrence of those milestone events forms the basis for Plaintiff's claim that Balt USA breached its obligation to use Commercially Reasonable Efforts. Rather, Plaintiff argues that Section 1.06(b)'s prefatory language mandates that Balt USA "shall pay" Neurvana the milestone payments on a date certain regardless of whether the relevant milestone is achieved.[155]

In addition to ignoring the manifest purpose of the earn-out structure—to allocate risk by requiring payment only upon the achievement of specific milestone events—Plaintiff's argument ignores the plain language of the Amended Agreement. In full, Section 1.06(b) requires payment only "*upon the achievement of the following milestone events.*"[156] The "Regulatory Milestones" subsections that

---

[154] *Id.* §§ 1.06(b)(i), (ii).

[155] *Id.* § 1.06(b).

[156] *Id.* (emphasis added).

follow also contain conditional language.[157]   Similarly, the "Commercial

Milestones" subsections that follow expressly acknowledge that a failure to receive

regulatory approval may result in *no* payments to Neurvana whatsoever.[158]   And in

Section 1.06(f) of the Amended Agreement, Neurvana expressly acknowledges that

"the achievement of any Milestone is uncertain and it is therefore not assured that

[Balt USA] will be required to pay any Milestone Payment at all if no Milestones

described in Section 1.06 are achieved."[159]

Plaintiff alternatively argues that the prevention doctrine applies because Balt

USA's supposed breaches impeded the conditions that would have triggered the

---

[157] The Regulatory Milestones provisions in Section 1.06(b)(i) require payment to Neurvana only where regulatory approval is obtained by a date certain. *Id.* § 1.06(b)(i)(1) (stating that the $250,000 CE Mark milestone payment shall be made "*in the event that the following shall have occurred on or prior to* September 30, 2018 (emphasis added)); *id.* § 1.06(b)(i)(2) (stating that the $250,000 510(k) approval milestone payment shall be made "*in the event that the following shall have occurred on or prior to* September 30, 2018." (emphasis added)).

[158] Each of the "Commercial Milestones" subsections contemplates "a payment, *if any*," to Neurvana using some multiple of "Titan Revenue." *See id.* §§ 1.06(b)(ii)(1)–(5). The term "Titan Revenue" is defined in Section 1.06(a)(vii) as "(a) the *actual gross amounts invoiced from or on account of the sale or distribution* of [Titan] by [Balt USA] . . . in a particular period" less certain specified deductions, and "(b) the royalties or license fees *actually received* from unaffiliated third parties by [Balt USA]" in connection with distribution rights Balt USA may have granted. *Id.* § 1.06(a)(vii) (emphases added).  In other words, "Titan Revenue" cannot exist without the sale or distribution of Titan—and the sale or distribution of Titan cannot occur without the requisite regulatory approvals. *See* Compl. ¶ 25 ("Before Neurvana could market and sell Titan, it had to . . . *acquire regulatory approvals*." (emphasis added)).

[159] Compl. Ex. A § 1.06(f).

milestone payments.[160] The prevention doctrine "provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent."[161] Plaintiff asserts that the doctrine applies here because "Balt continuously worked to undermine the application process and resulting payments."[162] This conclusory assertion is unsupported by the facts alleged in the Complaint. And as discussed above, Plaintiff's disagreement with the regulatory strategy Balt USA was contractually entitled to undertake does *not* give rise to the inference that Balt USA "wrongfully prevented" performance of the Amended Agreement.[163]

### 2. Count Four Fails to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

Count Four of the Complaint alleges that Balt USA breached the implied covenant of good faith and fair dealing. Under Delaware law, "[t]he implied

---

[160] Pl.'s Answering Br. at 28.

[161] *Mobile Commc'ns Corp. of Am. v. MCI Commc'ns Corp.*, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985) (emphasis added) (citations omitted).

[162] Pl.'s Answering Br. at 28.

[163] Some decisional authority suggests that the wrongful prevention doctrine's application is limited where "one party assumes the risk that fulfillment of the condition precedent will be prevented." *Mobile Comm'cns*, 1985 WL 11574, at *4. Defendants thus argue that Plaintiff expressly assumed the risk that it would not receive milestone payments when it agreed that Balt USA would have authority over all matters relating to Titan post-closing. Defs.' Reply Br. at 14. This decision notes the point without resolving it in view of the multiple other deficiencies in this aspect of Plaintiff's claim.

covenant is inherent in all contracts."[164]  Delaware courts have characterized the implied covenant as "a limited and extraordinary legal remedy"[165] whose application is a "cautious enterprise."[166]  "[T]he implied covenant 'does not apply when the contract addresses the conduct at issue,' but only 'when the contract is truly silent' concerning the matter at hand."[167]  The implied covenant "should not be applied to give plaintiffs contractual protections that 'they failed to secure for themselves at the bargaining table.'"[168]

Plaintiff argues that the implied covenant applies because the Amended Agreement is "silent about the sterilization protocol."[169]  That argument is inconsistent with the plain language of the Amended Agreement, which vests Balt USA with "authority over all matters relating to [Titan] after the Closing, including, but not limited to, any research, development, manufacturing, Commercialization, clinical trial design, site selection, regulatory, quality standards," and other

---

[164] *Dieckman v. Regency GP LP*, 155 A.3d 358, 366 (Del. 2016).

[165] *Oxbow Carbon & Minerals Hldgs. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010)).

[166] *Nemec*, 991 A.2d at 1125 (Del. 2010).

[167] *Oxbow*, 202 A.3d at 507 (first quoting *Nationwide Emerging Managers, LLC v. Northpointe Hldgs. LLC*, 112 A.3d 878, 896 (Del. 2015); then quoting *Allied Capital*, 910 A.2d at 1033).

[168] *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 636–37 (Del. Ch. 2011), *aff'd*, 76 A.3d 808 (Del. 2013) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1260 (Del. 2004)).

[169] Pl.'s Answering Br. at 31.

decisions.[170] Neurvana affirmatively agreed to vest Balt USA with the discretionary authority to proceed with any and all regulatory, commercial, and other decisions related to Titan post-closing.[171] This language suggests that conferred discretion to Balt USA "was a contractual choice to grant authority . . . not a gap."[172]

Of course, "vesting [a contracting party] with discretion does not relieve [the party] of its obligation to use that discretion constituently with the implied covenant of good faith and fair dealing."[173] Yet Plaintiff does not plead facts that Balt USA acted in bad faith when it exercised its discretion to pursue universal sterilization validation instead of a lot release sterilization protocol. For example, Plaintiff asserts that Balt USA "represented that they could achieve approval within 45 days" and that "[t]his timeline would have been possible only with a lot-release submission because universal validation takes more than 30 days."[174] But neither of the paragraphs to which Plaintiff cites for this proposition contain the factual allegation that universal sterilization validation takes more than thirty days.[175] Indeed, that

---

[170] Compl. Ex. A § 1.06(d)(i)(4).

[171] *Id.*

[172] *Oxbow*, 202 A.3d at 503.

[173] *Id.* (citing *Miller v. HCP Trumpet Investments, LLC*, 2018 WL 4600818, at *1–2 (Del. Sept. 20, 2018) (TABLE)); *Amirsaleh v. Bd. of Trade of N.Y.C., Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008) ("[T]he law presumes that parties never accept the risk that their counterparties will exercise their contractual discretion in bad faith.").

[174] Pl.'s Answering Br. at 32.

[175] *See* Compl. ¶¶ 46, 65.

allegation exists nowhere in the Complaint. And even if it did, Plaintiff does not allege that approval with a universal sterilization validation would have been impossible within the timeline Balt USA proposed.

### 3. Count Five Fails to State a Claim for Promissory Estoppel.

Count Five of the Complaint alleges that the doctrine of promissory estoppel makes Balt USA's "promise" to secure CE Mark approval using a lot release sterilization protocol within forty-five days an enforceable one. But Plaintiff's argument ignores well-settled Delaware law: "Promissory estoppel does not apply . . . where a fully integrated, enforceable contract governs the promise at issue."[176] The Amended Agreement contains an integration clause, which provides: "This Agreement and the documents referred to herein contain the complete agreement between the Parties relating to the subject matter hereof and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, which may have related to the subject matter hereof in any way . . . ."[177]

Plaintiff does not argue that the Amended Agreement is not fully integrated or that the Amended Agreement's integration clause is somehow void. Nor does Plaintiff dispute that Balt USA's alleged promise to secure CE Mark approval within

---

[176] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 348 (Del. 2013).

[177] Compl. Ex. A § 7.08.

53

forty-five days using a lot release sterilization protocol relates to "subject matter" of the Amended Agreement. Indeed, Plaintiff would be hard-pressed to make such arguments. Thus, the Amended Agreement supersedes the alleged promise made prior to its execution, and the doctrine of promissory estoppel may not be applied to revive them.

### 4. Count Ten Fails to State a Claim for Anticipatory Repudiation.

Count Ten of the Complaint alleges that Balt USA anticipatorily repudiated the Amended Agreement. As Chancellor Allen once observed, the doctrine of anticipatory repudiation derives from the principle that, "[i]f it is clear that the promisor intends not to perform his promise, there seems little reason to force the parties to wait to have their rights and obligations determined while markets rise and fall."[178] However, "[t]he theory justifying an action for breach of contract prior to the contracted-for time of performance really only holds when the repudiation is . . . 'positive and unconditional.'"[179] Thus, "[u]nder Delaware law, repudiation is an outright refusal by a party to perform a contract or its conditions"[180] requiring an "unequivocal statement"[181] of an intent not to perform.

---

[178] *Carteret Bancorp, Inc. v. Home Gp., Inc.*, 1988 WL 3010, at *5 (Del. Ch. Jan. 13, 1988).

[179] *Id.* at *6 (quoting 11 Williston on Contracts § 1322 (3d ed. 1968)).

[180] *CitiSteel USA, Inc. v. Connell Ltd. P'ship*, 758 A.2d 928 (Del. 2000).

[181] *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *15 (Del. Ch. Sept. 18, 2014) (quoting *Carteret*, 1988 WL 3010, at *5).

Plaintiff alleges that, "by unilaterally refusing to submit the CE Mark file to DQS for regulatory approval with a lot release sterilization protocol," Balt USA anticipatorily repudiated the Amended Agreement.[182]  But nowhere in the Complaint does Plaintiff allege that such unilateral refusal occurred.  In fact, the Complaint alleges the opposite: After a meeting between the parties on March 13, 2018, Yang wrote to Neurvana and represented that the CE Mark "application had been submitted [by Balt USA] with an aspiration indication and with a sterile lot release protocol."[183]  At no point, according to the Complaint, did Balt USA "unilaterally refuse" to submit its CE Mark application with a lot release sterilization protocol.

Rather than pointing the Court to an "unequivocal statement" by Balt USA evidencing an intent not to perform, Plaintiff points the Court to Balt USA's "actions" (in no definite terms) and argues that those actions "render[ed] contractual performance impossible."[184]  This argument is unpersuasive.  Nothing in the Complaint suggests that Balt USA's undefined actions made contractual performance impossible.

---

[182] Compl. ¶ 158.

[183] *Id.* ¶ 65.

[184] Pl.'s Answering Br. at 36.

### 5. Count Thirteen Fails to State a Claim for Indemnification.

Count Thirteen of the Complaint seeks indemnification for alleged losses incurred "[a]s a result of Balt's breaches of its obligations under the [Agreement]."[185] Section 5.03 of the Amended Agreement provides that Balt USA "shall indemnify" Neurvana and its representatives and "hold them harmless against any Losses paid, incurred, suffered or sustained . . . directly or indirectly, resulting from, arising out of, or relating to" any of the following:

> (a) Any inaccuracy or breach of any representation or warranty of [Balt USA] contained in [the relevant portion of the Amended Agreement]; (b) any non-fulfillment or breach by [Balt USA] of any covenant or agreement contained in this Agreement; (c) any Assumed Liability; and/or    (d) [Neurvana's]    development    and commercialization of the Titan Products.[186]

Plaintiff has failed to adequately plead that any of the four circumstances delineated in Section 5.03 are present. As discussed above, the Complaint does not demonstrate that any sort of inaccuracy, breach, or non-fulfillment of any of the covenants or obligations contained in the Amended Agreement.[187] Thus, Count Thirteen fails to state a claim upon which relief can be granted.

---

[185] Compl. ¶ 176.

[186] Compl. Ex. A § 5.03.

[187] Plaintiff does not argue that the "Assumed Liability" language in Section 5.03 applies in this case.

### 6. Counts Eleven and Fourteen Fail to State Claims for Alternative Forms of Relief.

Counts Eleven and Fourteen of the Complaint seek specific performance of the Amended Agreement and declaratory judgment concerning Balt USA's obligations at issue in Counts Three, Four, and Ten. Because each of the predicate claims to Counts Eleven and Fourteen fail to state a claim, the equitable and declaratory relief Plaintiff requests in connection with those claims is denied.

### C. The Contract Claim Against Ferrera

Count Six of the Complaint alleges that Ferrera breached the Consulting Agreement's confidentiality and non-disparagement clauses.[188] The confidentiality clause provides: "Consultant agrees during the term of this Agreement and for five (5) years thereafter that Consultant will take all steps reasonably necessary to hold Company's Confidential or Proprietary Information . . . in trust and confidence . . . ."[189] The non-disparagement clause provides: "Consultant agrees that he will not . . . make any non-flattering statement or disparage . . . the Company, its technology or business, or any of the (past, present or future) employees, officers,

---

[188] Although the Consulting Agreement is governed by California law, Consulting Agreement § 9(c), Delaware law provides the procedural standard, and thus Plaintiff must still plead facts under Rule 12(b)(6) sufficient to support a reasonable inference that Ferrera breached the Consulting Agreement.

[189] Consulting Agreement § 5(a).

managers, independent contractors, consultants, equity holders or lenders of the Company . . . ."[190]

Plaintiff first contends that Ferrera breached the confidentiality clause when he "revoke[d] Neurvana's license to use Balt's 'pusher' delivery system," and "demanded immediate payment" of the debts owed by Neurvana to Balt USA.[191] These events occurred throughout 2018, after Ferrera's resignation.[192] Plaintiff asserts that "the timing of each act was informed by Ferrera's inside knowledge as former chairman of the board of Neurvana's confidential financial information."[193] These allegations are conclusory and unsupported by well-pleaded facts in the Complaint. Other than by broad reference to Ferrera's "inside knowledge" as former Chairman,[194] Plaintiff pleads no facts indicating specifically or even generally which "nonpublic or proprietary information regarding [Neurvana or] its business" Ferrera possessed that was protected by the Consulting Agreement.[195] And other than the conclusory allegation that Ferrera "used confidential information about Neurvana to

---

[190] *Id.* § 8(a).

[191] Pl.'s Answering Br. at 54.

[192] Compl. ¶¶ 77, 87.

[193] Pl.'s Answering Br. at 54 (internal quotation marks omitted).

[194] Compl. ¶ 76.

[195] Consulting Agreement § 5(a) (defining the "Confidential or Proprietary Information" that Ferrera was prohibited from using).

harm and undermine Neurvana and its prospective business relations,"[196] Plaintiff pleads no facts indicating that Ferrera actually used such confidential information in a contractually prohibited manner. Plaintiff has failed to plead facts making it reasonably conceivable that Ferrera breached the Consulting Agreement's confidentiality clause.

Plaintiff next argues that Ferrera breached the non-disparagement clause when he "repeatedly disparaged Neurvana and its officers to investors, potential investors, members of Neurvana's board, and other people and entities in the neuro-medical device industry."[197] But this allegation was made merely "[u]pon information and belief" and was unsupported by well-pleaded facts in the Complaint—thus, the Court need not accept it as true.[198]

## D. The Tort Claims

Count One asserts that Balt USA fraudulently induced Neurvana to enter into the Amended Agreement. Count Two asserts that the same conduct giving rise to the fraudulent inducement claim gives rise to a claim for equitable fraud or negligent misrepresentation. Count Nine asserts that all Defendants tortiously interfered with

---

[196] Compl. ¶ 84.

[197] *Id.* ¶ 85.

[198] *See Griffin Corp. Servs., LLC v. Jacobs*, 2005 WL 2000775, at *6 (Del. Ch. Aug. 11, 2005) (addressing one of the plaintiffs' allegations made only "[u]pon information and belief" and concluding that "[s]uch a bald statement, without further factual allegations to support it, is merely conclusory and need not be accepted as true" (citing *Haber v. Bell,* 465 A.2d 353, 357 (Del. Ch. 1983)).

the development and commercialization of Neurvana's remaining two products, Lumenate and Dimension.

### 1.     Counts One and Two Fail to State Claims for Fraud.

Under Delaware law, a claim for fraud has five conjunctive elements: (1) a false statement, generally of fact, made by the defendant;[199] (2) the defendant's knowledge or belief that the statement was false at the time it was made, or the defendant's reckless indifference to statement's truth; (3) the defendant's intent to cause the plaintiff to act or refrain from acting as a result of the statement; (4) the plaintiff's justifiable reliance on that statement in acting or in refraining from acting; and (5) damages incurred as a result of that reliance.[200] To state a claim for equitable fraud, a plaintiff must "satisfy all the elements of common-law fraud with the exception that [the] plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly."[201]     To state a claim for negligent

---

[199] "In addition to overt representations, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144 (Del. Ch. 2003) (citing *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del. 1983)).  Though the Complaint alleges in a conclusory manner that Balt USA made "representations . . . by fraudulently concealing material facts," Plaintiff neither points to any such omission in the Complaint nor meaningfully argues that point in briefing.  Compl. ¶ 95; *see* Pl.'s Answering Br. at 39–48 (referring only to affirmative statements by Balt USA).

[200] *Solow v. Aspect Res., LLC*, 2004 WL 2694916, at *2 (Del. Ch. Oct. 19, 2004) (citing *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992)).

[201] *H-M Wexford*, 832 A.2d at 144 (quoting *Zirn v. VLI Corp.,* 681 A.2d 1050, 1061 (Del. 1996)).

misrepresentation, a plaintiff must show: (1) "a particular duty to provide accurate information, based on the plaintiff['s] pecuniary interest in that information;" (2) "the supplying of false information;" (3) "failure to exercise reasonable care in obtaining or communicating information; and" (4) "a pecuniary loss caused by justifiable reliance on the false information."[202]

Court of Chancery Rule 9(b) imposes a heightened pleading standard on plaintiffs asserting fraud claims. Specifically, Rule 9(b) requires that "the circumstances constituting fraud . . . be stated with particularity."[203] "Under Rule 9(b), the circumstances that must be stated with particularity are the time, place, and contents of the false representation, the identity of the person(s) making the representation, and what he intended to obtain thereby."[204] "It is not necessary under Rule 9(b) to plead knowledge or intent with particularity."[205] "Essentially, to satisfy that requirement, the plaintiff must allege circumstances sufficient to fairly apprise the defendant of the basis for the claim."[206]

---

[202] *Id.* at 147 n.44 (citing *Glosser v. Cellcor, Inc.,* 1994 WL 593929, at *22 (Del. Ch. Oct. 17, 1994)).

[203] Ct. Ch. R. 9(b).

[204] *H-M Wexford*, 832 A.2d at 145 (citations omitted).

[205] *KnightTek, LLC v. Jive Commc'ns*, -- A.3d --, 2020 WL 414434, at *6 (Del. Jan. 27, 2020); Ct. Ch. R. 9(b) ("Malice, intent, knowledge and other condition of mind . . . may be averred generally.")

[206] *H-M Wexford*, 832 A.2d at 145 (citing *Norman v. Paco Pharm. Servs., Inc.,* 1989 WL 110648, at *10 (Del. Ch. Sept. 22, 1989); *Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. Hunt Int'l Res. Corp.*, 1987 WL 55826, at *6 (Del. Ch. Feb. 27, 1987)).

Plaintiff argues that Balt USA, through its agents and representatives, made several misrepresentations that induced Plaintiff to enter into the Amended Agreement. Specifically, Plaintiff takes issue with Balt USA's statements that due to its superior relationships, resources, and expertise, Balt USA could obtain CE Mark approval for Titan faster than Neurvana could, within forty-five days.[207]

The allegations supporting Plaintiff's fraud claims closely resemble the allegations supporting Plaintiff's failed claim for promissory estoppel—and Plaintiff's fraud claims may fail for the same reasons.[208] In any event, Plaintiff has failed to adequately plead one element common to each of the three Tort Claims— an actionable false statement.[209]

---

[207] Compl. ¶¶ 96–98.

[208] There exists some support for the notion that an integration clause containing unambiguous anti-reliance language precludes a finding of justifiable reliance, thus barring certain fraud claims. *See H-M Wexford*, 832 A.2d at 142 (dismissing a fraud claim for failure to demonstrate justifiable reliance and stating that, "if [the plaintiff] wanted to be able to rely upon [a private placement memorandum it received prior to signing the agreement] or particular facts represented therein, it had an obligation to negotiate to have those matters included within the scope of the integration clause of the contract"). *Cf. Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004) ("The presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims."). Because Plaintiff's fraud claims fail for more obvious reasons, the Court need not reach this issue.

[209] Plaintiff's reliance on *Narrowstep, Inc. v. Onstream Media Corp.* is misplaced. Pl.'s Answering Br. at 42 (citing *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *12 (Del. Ch. Dec. 22, 2010)). In *Narrowstep*, the Court held that the plaintiff successfully pleaded the false statement element of its fraud claims. *Narrowstep*, 2010 WL 5422405, at *12 (explaining that the plaintiff, Narrowstep, adequately pleaded the elements of its fraud claims, stating: "Narrowstep alleges that Onstream made several

Balt USA's statement that it could secure CE Mark approval within forty-five days is a forward-looking opinion, and such opinions are generally not actionable as fraud.[210] Acknowledging this line of case law,[211] Plaintiff first argues that the disputed statement misrepresented facts known by Balt USA ("then-existing facts")[212] at the time the statement was made about Balt USA's "supposed superior relationship with European regulators that would allow Titan to rapidly achieve CEM."[213] Delaware law recognizes that forward-looking statements can support a claim of fraud where the declarant knows the statement to be false at the time it is made.[214] In this case, Plaintiff neither alleges nor argues what then-existing facts

false representations with respect to its communicated desire to close a merger with Narrowstep in an expeditious manner."). In so holding, the Court observed that "the Complaint sufficiently describe[d] the details" of the alleged misappropriation scheme, which in turn indicated that the false representations were made intentionally. *Id.* Here, unlike in *Narrowstep*, Plaintiff has *not* properly alleged that Balt USA made "false representations" in the first place.

[210] *Grunstein v. Silva*, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009) (observing that "expressions as to what will happen in the future are not actionable as fraud" (citation omitted)); *BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *7 (Del. Ch. Aug. 3, 2004) ("Expressing opinions or predictions about the future, however, 'cannot give rise to actionable common law fraud.'" (quoting *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. 2001))).

[211] Pl.'s Answering Br. at 43 (acknowledging that "representations regarding future conduct, predictions, and expressions of opinion generally do not create actionable fraud").

[212] *Id.* at 40.

[213] *Id.* at 42.

[214] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006); *see also KnighTek*, 2020 WL 414434 at *6 (applying Utah law, distinguishing between "forward-looking predictions or opinions that are subject to uncertainty and predictions or opinions

were supposedly false.[215] The Complaint does not support a reasonable inference that Balt USA lacked superior relationships, resources, and expertise; in fact, the Complaint supports the contrary inference.[216] And the 45-day prediction is a pure expression as to what might happen in the future and not alleged to be based on any specific fact known at the time the statement was made.[217]

Tacitly conceding Balt USA's superior knowledge and that the disputed statement was an opinion only, Plaintiff next argues that "even an opinion may rise to the level of a misstatement of fact when made by one with special or superior knowledge."[218] Once again, however, Plaintiff fails to point to any supporting allegations or otherwise develop this argument.

---

that the speaker knows are false," and ruling that the complaint adequately alleged that the defendant knew the statement to be false due to "presently existing material fact[s]").

[215] *Compare* Compl. ¶ 96 ("These misrepresentations included the claim that Balt had superior relationships, resources, and expertise, which would lead to faster CE Mark approval than Neurvana could achieve."), *and id.* ("Balt represented that it could obtain CE Mark approval for Titan within 45 days"), *with KnighTek*, 2020 WL 414434 at *2 (finding it reasonably conceivable that defendant's statement that plaintiff would have to wait more than five years to be bought out was known to be false when made where, the day after the plaintiff agreed to be paid out at a discount, a change of control transaction that would have accelerated the defendant's payment obligations in full occurred).

[216] *See, e.g.*, Compl. ¶¶ 99, 108, 152 (referring to the foreseeability of Neurvana's alleged damages given "Balt's knowledge of the industry and Neurvana's products").

[217] In briefing, Plaintiff states: "Discovery will show either that Defendants knew they were lying when they claimed that Balt could rapidly achieve [CE Mark approval] and fulfill the intent of the [Amended Agreement], or that they did not care if what they said was true." Pl.'s Answering Br. at 40. But Plaintiff cannot point to future discovery to bolster its allegations at the pleading stage.

[218] Pl.'s Answering Br. at 43 (citing *Aviation West Charters, LLC v. Freer*, 2015 WL 5138285, at *6 (Del. Super. Ct. July 2, 2015); *Wal-Mart Stores, Inc. v. AIG Life*

### 2. Count Nine Fails to State a Claim for Tortious Interference with Prospective Economic Advantage.

"To survive dismissal, a claim for tortious interference with business relations must allege: '(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages.'"[219]

---

*Ins. Co.*, 901 A.2d 106, 116 (Del. 2006)). Plaintiff's reliance on *Aviation West Charters* and *Wal-Mart* is misplaced. In *Aviation West Charters*, the Delaware Superior Court did *not* find that the misrepresentation forming the basis for the plaintiff's fraudulent inducement claim was an opinion. 2015 WL 5138285, at *7 (holding that a company's inflation of its accounts receivable was "a statement of past fact—not one of opinion or future conduct"). And the expression of opinion in *Wal-Mart* is distinguishable from that in this case. In *Wal-Mart*, several brokers sold to Wal-Mart corporate-owned life insurance policies ("COLIs") that they represented would generate significant tax benefits. 901 A.2d at 111. The brokers assured Wal-Mart that in the "worst case" scenario, Wal-Mart would only lose $283,000. *Id.* But after an adverse change in tax laws, the COLIs did not generate tax benefits, and Wal-Mart allegedly suffered more than $100 million in damages. *Id.* at 110. The Delaware Supreme Court held that, while the broker's assurance that Wal-Mart would only lose $283,000 in the "worst case" scenario was an opinion, it was "the type of opinion that suggests the reasonable belief that it was based on facts known to the maker." *Id.* at 116. This was so because the brokers, who were "experts in COLI plans," should have known that the COLIs "deviated from industry standards, and that those deviations had prompted regulators to question or disapprove similar plans." *Id.* at 111, 116. There are no similar allegations here. Plaintiff does not allege that Balt USA's approach "deviated from industry standards" or that Balt USA's approach would have been impossible.

[219] *Malpiede v. Townson*, 780 A.2d 1075, 1099 (Del. 2001) (quoting *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981)). Though Plaintiff asserts Count Nine as a claim for "tortious interference with prospective economic advantage," that claim is the same as one for "tortious interference with business relations." *See* Pl.'s Answering Br. at 56 (citing the elements of a claim for tortious interference with business relations).

Plaintiff's claim fails on the first element. "To meet the reasonable probability of a business opportunity prong, a plaintiff 'must identify a specific party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant . . . .'"[220] The plaintiff "cannot rely on generalized allegations of harm."[221] "Furthermore, '[t]o be reasonably probable, a business opportunity must be something more than a mere hope . . . or a mere perception of a prospective business relationship.'"[222]

The Complaint does not allege that any party, let alone a "specific party," was prepared to partner with Neurvana to develop and commercialize Lumenate or Dimension. In briefing, Plaintiff highlights the potential value of Lumenate and Dimension, Defendants' knowledge of this value, and Defendants' "intentional[] sabotage[]" of CE Mark approval for Titan "in order to prevent Neurvana from being able to commercialize Dimension and Lumenate."[223] But these general points do not identify the existence of a specific party or support a reasonable inference of the existence of a specific party.

---

[220] *Soterion Corp. v. Soteria Mezzanine Corp.*, 2012 WL 5378251, at *13 (Del. Ch. Oct. 31, 2012) (quoting *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009)).

[221] *Id.* (quoting *Agilent*, 2009 WL 119865, at *7).

[222] *Id.*

[223] Pl.'s Answering Br. at 57.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss for lack of personal jurisdiction pursuant to Court of Chancery Rule 12(b)(2) is GRANTED as to Girin and DENIED as to Ferrera. Defendants' motion to dismiss for failure to state a claim pursuant to Court of Chancery Rule 12(b)(6) is GRANTED as to Counts One, Two, Three, Four, Five, Six, Nine, Ten, Eleven, Twelve, Thirteen, Fourteen, and Count Seven concerning Ferrera's post-resignation conduct and DENIED as to Count Seven concerning Ferrera's pre-resignation conduct.